IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
DIVISION

IN RE:                               §
                                     §              CASE NO. 06-60121-V2-13
JAMES PATRICK ALLEN                  §

**MEMORANDUM OPINION**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING**
**ORDER DENYING MOTION FOR TURNOVER & ACCOUNTING (doc # 38),**
**AND CONCERNING CONFIRMATION OF CHAPTER 13 PLAN (doc # 9)**

Debtor filed a petition commencing this chapter 13 case on August 1, 2006, and filed his chapter 13 plan on August 15, 2006 (docket # 9). On September 27, 2006, the chapter 13 trustee recommended that the Court confirm the plan based on the trustee's conclusion that the plan and the Debtor met all statutory requirements for confirmation. After the deadline for filing objections to confirmation had passed, Countrywide Home Loans Inc. ("Countrywide") filed a motion for accounting and turnover of rents (docket # 38) and an objection to confirmation of Debtor's chapter 13 plan. For reasons set forth in more detail below, and by separate order issued this date, Countrywide's motion for turnover and accounting is denied and Debtor's chapter 13 plan is confirmed.

**JURISDICTION**

This is a contested matter, a civil proceeding, arising under title 11 in a case filed under title 11 of the United States Code. The United States District Court has jurisdiction under 28 U.S.C. § 1334(b). By Order dated August 9, 1984, superseded by General Order 2005-6 on March 10, 2005, under authority granted by 28 U.S.C. §157(a), the United States District Court for the Southern District of Texas referred all such proceedings to the bankruptcy judges for the district. This is a core proceeding as defined by 28 U.S.C. §157(b)(2)(L). The bankruptcy judge may hear and may determine core proceedings, 28 U.S.C. §157(b)(1). No party has objected to the exercise of core jurisdiction by the undersigned bankruptcy judge.

**FACTS**

At the hearing on December 12, 2006, the parties offered no testimony. They submitted stipulated exhibits: the mortgage note, the deed of trust, and selected bankruptcy schedules. There is, therefore, no conflicting evidence.

On November 24, 2004, James Allen ("Debtor") signed a note for $115,290 secured by a deed of trust on land located at 513 Danforth Road, Goliad TX (the "Danforth Road Property"). The note was eventually assigned to Countrywide. The deed of trust states that Debtor intends to occupy the property as his principal residence. But the deed of trust also provides for assignment of rents and revenues. The Debtor is authorized to collect the rents and revenues for the joint

benefit of Debtor and Countrywide until Countrywide declares a default; after that, collection is for the sole benefit of Countrywide.  No evidence was introduced concerning when Debtor ceased to occupy the property as his residence and rented it to his brother for $650 per month.

Although the rental is paid by Debtor's brother, there was no allegation or evidence that the rental is less than market value.  Debtor's chapter 13 plan proposes to value Countrywide's collateral at $58,000 and to pay Countrywide 57 payments of $1,128.08 per month for a total of $67,865 which includes interest at 6.25%.  These payments to Countrywide under the plan exceed the rents by $478 per month, which sum Debtor derives from his other income.  On August 18, 2006, Countrywide filed proof of claim # 4, valuing its collateral at $58,000. Therefore, there is no dispute between the parties over the valuation of the collateral. Countrywide has withdrawn any contention that the collateral is debtor's principal residence.

On November 8, 2006, only 4 business days prior to the final hearing on plan confirmation, Countrywide filed two pleadings. First, in docket # 38, Countrywide asked for an accounting and turnover of rents, taking the position that the assignment of rents in the deed of trust was an absolute assignment and not a collateral security interest.  In that pleading, Countrywide alleges that it reviewed the file after the first hearing on plan confirmation and "discovered" that there was an assignment of rents.  Countrywide demands that Debtor pay Countrywide all rents received from September 2006 through November 2006 and for Debtor's tenant to pay the rent directly to Countrywide after that. Second, in docket # 39, Countrywide asserts that because the rents belong to Countrywide, Debtor is not allowed to use them to fund the chapter 13 plan.

## LEGAL ANALYSIS

### I.      Objection To Confirmation of Chapter 13 Plan Was Filed Late

Bankruptcy Local Rule 2002(c)(2) requires the Clerk to send a notice to creditors that objections to confirmation must be filed 5 days prior to the confirmation hearing.  That notice was sent on August 24 (docket # 17).  It was served on Countrywide (docket # 19).  The Trustee sent a separate notice on August 24 (docket # 18).  Countrywide was served with that notice (docket # 20).

When fewer than 8 days are allowed, holidays and weekends are not counted, FRBP 9006(a).

The first confirmation hearing was set for October 3, 2006.  Therefore, the deadline for objections to confirmation was September 26.  Although Countrywide filed an objection on September 15, that objection makes no sense whatsoever, and even Countrywide's counsel admits that the pleading makes no sense.  The Court will deal separately with Rule 9011 issues.

To give Countrywide an opportunity to correct its pleading, the Court continued the confirmation hearing to November 14, 2006.  The deadline for an objection, then, would have been November 7, 2006.  It is not clear when Countrywide reviewed its file and discovered its assignment of rents, but the objection raising that objection was not filed until November 8.

Because Debtor's counsel stated that she had not received the objection in time to respond, and because Countrywide had not adequately addressed the Court's Rule 9011 issues regarding the initial objection, the Court continued the confirmation hearing to December 12.

Countrywide's objection was filed late and therefore should be denied, even if it had merit.  But as set out below, the objection does not have merit.

## II.   Countrywide Has a Security Interest, Not An Ownership Right, in Rents

Countrywide's motion for an accounting and for turnover of rents, and Countrywide's objection to confirmation of Debtor's chapter 13 plan are both based on Countrywide's contention that its deed of trust gives it an absolute assignment of rents, not a security interest in rents.  For the following reasons, the Court finds that contention to have no merit.

### A.   *Summary of Applicable Law*

State law governs the creation, definition, and perfection of property rights and security interests that are applied in bankruptcy cases. *Butner v. U.S.*, 440 U.S. 48 (1979); *In the Matter of Village Properties, Ltd.* 723 F.2d 441 (5th Cir. 1984).

Texas jurisprudence recognizes two types of assignments of rent.  An assignment of rent can be either a collateral assignment (security interest) or an absolute assignment.  The intent of the parties determines which type of assignment the documents create.  Public policy favors an interpretation that the documents create a collateral interest.  Clear evidence is required to conclude that the parties intended an absolute assignment.  When rents are assigned as additional security in a deed of trust, and the entitlement to rents requires some affirmative action by the lender, the assignment is a security interest, not a present property right.  When the entitlement to rents is self-executing, and effective without action by the mortgagee, the assignment is an absolute assignment.  Even if the assignment is an "absolute assignment," the rents merely serve as security for the loan.  The difference between a collateral assignment and an absolute assignment is the authority for direct application of payments that the creditor has without execution. *Taylor v. Brennan*, 621 S.W.2d 592 (Tex. 1981); *In the Matter of Village Properties, Ltd.*, 723 F.2d 441 (5th Cir. 1984); *In re Casbeer*, 793 F.2d 1436 (5th Cir. 1986); *FDIC v. International Property Management Inc.*, 929 F.2d 1033 (5th Cir. 1991); *Nolana v. RTC Mortgage*, 944 S.W.2d 751 (Tex. App. - Corpus Christi 1997); *The Cadle Company v. Collin Creek Phase II Associates. Ltd.*, 998 S.W.2d 718 (Tex. App. - Texarkana 1999).

### B.   *Texas Law in More Detail*

#### 1.   *Taylor v. Brennan*

In *Taylor*, Brennan sold an apartment complex to Taylor subject to a first lien deed of trust and assignment of rents in favor of First Continental Mortgage.  Taylor executed a promissory note in favor of Brennan secured by a second lien deed of trust and an assignment of rents.  In the second lien deed of trust and assignment of rents, Taylor warranted to make all payments and to perform all obligations required by the first lien note in favor of First Continental.  Taylor collected rents and made payments to Brennan as required by the Brennan note, but did not make payments to First Continental.  Brennan foreclosed on the property and

sued Taylor for waste of security alleging that the rents Taylor collected were to be used specifically for payment of the first and second lien mortgage notes.  The trial court and first appellate court found that the assignment of rent was absolute and awarded Brennan damages. On further appeal, the Texas Supreme Court found the assignment to be a security interest.  The issue on appeal was whether the assignment of the rents operated as an absolute assignment to Brennan so as to transfer rents automatically upon default or whether the assignment of rents operated merely as a pledge to secure a debt and thus must be activated by some affirmative act by Brennan.

The court concluded that the "probable intention" of the parties as well as public policy favored construing assignments of rents as security interests instead of absolute transfers, and that "mere words of assignment" are inadequate to overcome that public policy.  Citing *Prudential Insurance Company of America v. Liberdar Holding Corp.*, 74 F.2d 50 (2d Cir. 1934) with approval:

> It seems unlikely that mere words of assignment of future rents can entitle a mortgagee to claim rentals which have been collected by a mortgagor and mingled with its other property. Sound policy as well as every probable intention should prevent a mortgagee from interfering with the mortgagor's possession until the mortgagee takes steps to get the rentals within his control. To hold otherwise would be to impose unworkable restrictions upon industry in cases where mortgagors have been led to suppose that they might rightfully apply the rentals to their own business.

The court also cited the dangers of giving a creditor the right to collect rents but imposing no duty on the creditor to collect the rents.  The Court cited with approval Osborne, G., *Mortgages* (2d Ed. 1970) § 150 at 252:

> …[T]o construe the clause as an absolute assignment of rents would impose no duty upon the mortgagee to collect rents, and gives the mortgagor no assurance that the mortgagee would collect them and apply them to the debt.

The court held that whether an assignment is a security interest or an absolute assignment turns on the intent of the parties which is determined by construing the instruments.  621 S.W.2d at 594.

The *Taylor* court found that if the assignment becomes operative only upon the creditor taking some action, *i.e.* upon default, not immediately on the date that the document was executed, then the assignment of rents was a security interest and not an absolute assignment.

### 2. Intent of the Parties is Determined by Reading Documents Entirely and in Context, Not By Isolated Words or Phrases

Cadle Company owned two notes signed by the Collin Creek Phase II Associates.  The Notes were secured by an assignment of rents.  *Cadle Co. v. Collin Creek Phase II Associates, Ltd.*, 998 S.W.2d 718 (Tex. App. 1999).  Cadle foreclosed on the property and sued Collin Creek to recover the rents collected in the period between the date of default and the date of foreclosure.

> Cadle argues that the assignment of rents clause above is an absolute assignment. Specifically, Cadle points out that the first paragraph of the assignment clause states that Collin Creek absolutely and unconditionally assigns, transfers, and conveys all rents.  Cadle also contends that the sentence stating that "[f]ailure ⋯ to collect said Rents shall not in any manner impair the subsequent enforcement… of the right, power and authority herein conferred upon [Cadle]" indicates the assignment is absolute.

The court rejected Cadle's reliance on the words "absolute assignment" and held that no magic word or phrase is determinative.  "All of the provisions must be considered with reference to the whole instrument, and no single provision taken alone will be given controlling effect." *Id*. at 723.  Based upon its reading of the whole document, the court found that the assignment of rents was not an absolute assignment.

### 3. Assignments of Rents in Bankruptcy

#### a. A creditor must "perfect" a collateral assignment of rents before its rights can take effect.

*In the Matter of Village Properties, Ltd.*, 723 F.2d 441 (5th Cir. 1984), addresses whether a mortgagee with a collateral assignment of rents (not an absolute assignment) is entitled to rents that accrued subsequent to the filing of a bankruptcy petition when the creditor had attempted to foreclose prior to the bankruptcy filing but had taken no specific steps with respect to execution on the assignment of rents either before the bankruptcy petition or subsequently.  The Court of Appeals for the Fifth Circuit held that the creditor was not entitled to post-petition rents.  The Court held that the assignment of rents was "impotent" because "the appellant did not even attempt to obtain sequestration or take other affirmative action. He therefore has not perfected his interest."  *Id*. at 446.

#### b. A post-petition motion for relief from the stay and motion for preliminary injunction to prohibit a bankruptcy debtor from using rents subject to a collateral assignment of rents is sufficient to perfect a creditor's rights in the rents.

*In re Casbeer*, 793 F.2d 1436 (5th Cir. 1986), addresses whether a creditor has perfected its collateral assignment of rents when it took no pre-bankruptcy action to take possession of the rents but filed a motion for relief from the stay and a motion for preliminary injunction to prohibit the debtor from using cash collateral.  The Court of Appeals for the Fifth Circuit held that the creditor's interest in cash collateral was perfected by those actions.

    c.     **When the document clearly establishes that, effective immediately upon execution of the document, the mortgagor collects and holds rents in trust for the sole benefit of the creditor, the assignment is an absolute assignment effective in bankruptcy cases with respect to funds that have not been commingled.**

*FDIC v. International Property Management, Inc.*, 929 F.2d 1033 (5th Cir. 1991), provides an excellent review and survey of the jurisprudence, as well as a small excursion into the theoretical basis for the "absolute assignment" concept.

A property manager collected rents and held them in escrow. The mortgagor and mortgagee then contested, in this case, whether the assignment of rents was an absolute assignment or whether the mortgagee had merely a collateral interest that had not been timely perfected prior to collection of the rents. The rents had not been commingled or otherwise used by the mortgagor.

First the decision notes that the concept of "absolute assignment" is a "legal fiction", and that the purpose of the jurisprudential construct is to secure a debt, no matter the language about "absolute assignment."

> The concept of a present transfer of title to rents contingent upon default, as opposed to a security interest in the rents, is essentially a legal fiction…Whatever terminology the court uses, however, mortgagees employ such assignments to secure the debt. *Id*. at 1035.

The Court of Appeals for the Fifth Circuit notes the following essential elements of an absolute assignment:

> Because an <u>absolute assignment generally is not intended by the parties</u>, Texas, for public policy reasons, requires <u>especially clear evidence that the parties intended to create such an assignment</u>. If the assignment contains words such as "security" or "pledge," <u>or if it requires some action by the mortgagee after default to secure the rents</u>, the clause will not be construed as an absolute assignment. *Id*. at 1036. (Emphasis supplied.)

Of signal significance, the opinion notes that the legal fiction of "absolute assignment" rests on a "trust concept". *See*, *Id.* at 1036 n.2. In a true absolute assignment, the parties intend that the mortgagor will collect the rents in trust and will hold them for the benefit of the mortgagee, without requiring future action by the mortgagee to perfect the trust; the rents are held in trust for application according to specific rules as provided in the assignment document.

Having found all of the requisite intent in the document then before it, the Fifth Circuit held that the assignment in that case was an absolute assignment and that the FDIC was entitled to the money held in escrow by the property manager.

It is important to remember, however, that the intent in this case was clear and this case did not involve a dispute over money that had been spent or commingled by the mortgagor, and the dispute did not involve a contest by third parties to the funds.  The court expressly limited its opinion:

> We do not intimate how we might resolve a similar dispute
> involving the rights of third parties, or a dispute in which the rents
> at issue had been commingled with other funds. Because the
> instant case involves the rights only of the parties to the
> assignment, and because their intent to transfer the right to rents
> immediately upon default is clear, we find no reason not to give
> effect to their agreement.
> *Id.* at 1038 n.7.

### 4.   Jurisprudence Applied to the Facts of This Case

The Deed of Trust that Debtor gave to Countrywide in this case reads, in pertinent part, as follows:

> 5.     Borrower shall occupy, establish and use the Property as
> Borrower's principal residence within sixty days after the
> execution of this Security Instrument  (or within 60 days of a later
> sale or transfer of the Property) and shall continue to occupy the
> Property as Borrower's principal residence for at least one year
> after the date of occupancy, unless Lender determines that
> requirement will cause undue hardship for Borrower, or unless
> extenuating circumstances exist which are beyond Borrower's
> control… Borrower shall also be in default if Borrower, during the
> loan application process, gave materially false or inaccurate
> information or statements to Lender (or failed to provide Lender
> with any material information) in connection with the loan
> evidenced by the Note, including, but not limited to representations
> concerning Borrower's occupancy of the Property as a principal
> residence…
>
> 9.     Lender may… require immediate payment in full of all
> sums if: (b)(ii) the property is not occupied by the purchaser or
> grantee as his or her principal residence…
>
> 17.     Borrower unconditionally assigns and transfers to Lender
> all the rents and revenues of the Property.  Borrower authorizes
> Lender or Lender's agents to collect the rents and revenues and

hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant…

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of the Lender. This assignment of rents of the Property shall terminate when the debt secured by the Instrument is paid in full.

The Court has found only a handful of reported decisions that find that an assignment was an absolute assignment and not a security interest. All of these cases involve commercial properties, situations in which rents were anticipated. *See*, *Federal Deposit Insurance Co. v. Int'l Property Management, Inc.*, 929 F.2d 1033 (5th Cir. 1991) (assignment of rents for apartment complex stated as "intended to be absolute, unconditional, presently effective" and it would never be necessary for holder to institute legal proceedings); *801 Nolana, Inc. v. RTC Mortgage Trust 1994-S6*, 944 S.W.2d 751 (Tex. App. 1997) (office building); *Peveto v. D'Entremont*, 900 S.W.2d 142 (Tex. App. 1995) (court does not decide this issue but dissent acknowledges assignment of rents of commercial building are absolute where grantor assigned all present and future rents, default would automatically terminate grantor's right to collect rents, and mortgagee not required to act); *In re Fry Road Associates, Ltd.*, 64 B.R. 808 (Bankr. W.D. Tex. 1986) (assignment of shopping center rent is absolute where debtor instructed all tenants to pay rentals directly to GECC at time of financing). Furthermore, what the above cases have in common is that the absolute assignment of rents is presently effective and the assignee is explicitly relieved of taking any action to perfect the assignment of rents.

The assignment of rents that Debtor gave Countrywide by contrast, does not contemplate immediate transfer of the right to rents. The deed of trust requires Debtor to make the property

his principal residence and to remain there for at least one year.  Thus, when the document was executed, the parties did not anticipate that there would be any rents.

Furthermore, although boilerplate "absolute assignment" language is included in the document, action by Countrywide is required before Debtor is required to pay rents to Countrywide.  The provision for entitlement to rents <u>prior</u> to Countrywide giving notice of an event of default is as follows:

> <u>[P]rior to Lender's notice to Borrower of Borrower's breach</u> of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as <u>trustee for the benefit of Lender and Borrower</u>.  This assignment of rents constitutes an absolute assignment and not an assignment for additional security only. (Emphasis supplied.)

Therefore, prior to a notice of default, Debtor and Countrywide were equal beneficiaries of the trust in which Debtor was to hold the rents.  The relative beneficial interests in the rents is not specified in the document.  There is no limitation on Debtor's use of the funds prior to notice of default.  The next paragraph provides:

> <u>If Lender gives notice of breach to Borrower</u>: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant…(Emphasis supplied.)

Countrywide becomes sole beneficiary of the rents <u>only</u> if Countrywide gives notice of default.  Because Debtor was a co-equal beneficiary before notice of the default, he had every reason to believe that he might "rightfully apply the rentals" to his own benefit.  Therefore public policy requires interpretation of this document as effecting a collateral interest only.  *See*, *Taylor supra*.

Texas, requires "especially clear evidence" (*International Property Management, supra*) that the parties intended to create an absolute assignment of rents.  The deed of trust in the case at bar is at least ambiguous.  Obviously the parties did not intend that the assignment of rents would be operative upon execution of the document because there would be no rents immediately upon the execution of the document; the deed of trust required the property to be used as homestead for at least one year.  In addition, the document by its terms provides that Debtor loses his right to rents (*i.e.* his right as beneficiary of the trust in which he holds rents) only when Countrywide gives notice of default.  And Countrywide's own pleadings (docket # 38, paragraph 4) state that Countrywide "discovered" the assignment of rents only after reviewing the file after the bankruptcy case was filed.

At the hearing on December 12, Countrywide's counsel was asked to define the consideration that Debtor received for the assignment of rents. Counsel replied that consideration was the same loan for which Debtor had executed a promissory note. When asked the value of the rents at the time the assignment was effected, counsel responded that the parties had assigned no value to the rents because they were intended as collateral of the loan.

### C.    Conclusion

Based on all of these facts and circumstances, the Court concludes that the assignment of rents in this case is a collateral interest and not an absolute assignment.

### III.    Countrywide's Objection to Plan Confirmation

### A.    Parties Rights and Obligations Changed by Bankruptcy Law

Countrywide's objection is not completely clear. To try to sort this out, the Court first analyzes Countrywide's rights under state law as if Debtor had not filed a bankruptcy case and then analyzes how bankruptcy law changed that.

Under Texas law, absent bankruptcy, Countrywide had a right to receive the unpaid principal and accrued interest at the time the bankruptcy case was filed plus interest and other contractual fees subsequently accruing. Until Countrywide declared a default, Debtor had the right to collect the rents as trustee for himself and Countrywide. The deed of trust did not specify to whom Debtor was to pay the funds held in trust, did not specify the rights of Debtor as beneficiary *vis a vis* the rights of Countrywide as beneficiary, and did not specify the uses (or limitation of uses) of the funds prior to Countrywide's declaration of default. If Debtor failed to pay the regular monthly installments as provided in the note, Countrywide had the authority to declare a default, to require Debtor to remit rent payments directly to Countrywide for application against the note and alternatively to require the tenant to begin making rent payments directly to Countrywide for application to the note. Countrywide had the right to require the trustee under the deed of trust to sell the property and to pay the sales proceeds to Countrywide, and Countrywide had the right to pursue Debtor for a deficiency if the foreclosure sale was properly conducted.

There is no evidence that Countrywide pursued any of these rights prior to bankruptcy except for the right to receive and to deposit note payments from Debtor. Specifically with respect to the rents, paragraph 6 of Countrywide's memorandum (docket # 50) states, "It is undisputed that Countrywide did not attempt to collect any of the alleged rent income before the petition date." The Court notes from the docket of this case that Countrywide took no action in the bankruptcy case with respect to the rents until November 8, 2006, docket # 38, the motion to compel accounting and turnover. Therefore, Countrywide's rights were perfected on November 8, 2006, assuming that the motion was adequate for that purpose. Countrywide's request for turnover and accounting for September and October has no merit.

When Debtor filed his bankruptcy petition, the rights of the parties changed. Debtor was required to file a chapter 13 plan, to make payments to the chapter 13 trustee according to the chapter 13 plan, and the Court was required to confirm the chapter 13 plan if the requirements of

Bankruptcy Code § 1325 were met.  With respect to Countrywide's secured claim, the Court is required to confirm the chapter 13 plan (i) if the plan provides that Countrywide retains its lien until Countrywide is paid the amount provided in the plan (Bankruptcy Code § 1325(a)(5)(B)(i)(I)(bb)), and (ii) if the plan provides for payment of the present value of Countrywide's allowed secured claim as determined under bankruptcy law (Bankruptcy Code § 1325(a)(5)(B)(ii)).  The allowed amount of Countrywide's secured claim under bankruptcy law is the value of Countrywide's collateral, (Bankruptcy Code § 506(a)(1)).  Both Countrywide and Debtor value Countrywide's collateral at $58,000.  (*See* Debtor's chapter 13 plan, docket # 9, and Countrywide's proof of claim, POC #4).  The payments that Debtor proposes to pay Countrywide under the plan meet the requirements of § 1325(a)(5)(B)(ii) for an allowed secured claim of $58,000; therefore the requirements of § 1325 are met with respect to Countrywide's claim.  If the Court confirms the plan, the Debtor and Countrywide are bound by its provisions (Bankruptcy Code § 1327(a)).  If Debtor makes all required payments, Debtor's obligation to Countrywide will be paid to the extent of $58,000, Countrywide's lien will be eliminated because Countrywide's secured claim is provided for in the plan, and any deficiency claim in excess of $58,000 will be discharged.  (Bankruptcy Code §§ 1325(a((5)(B)(i)(I)(bb)), 1327(b), 1327(c), 1328.)

**B.    *Countrwide Argues That Debtor Cannot Use Its Rents to Fund the Plan***

Rents are $650 per month.  Countrywide's note calls for payments of $974.99 per month.  Debtor's chapter 13 plan provides that Debtor will pay to the chapter 13 trustee $1,325 per month and that the trustee will pay Countrywide $1,128 per month.  There is no question that the plan calls for payment to Countrywide of an amount that exceeds the rents and exceeds the monthly note payment as well.

Therefore, to the extent that Countrywide's argument is that the rents must be used to pay its allowed secured claim, the objection is satisfied.  Debtor will use the rents, and more, to pay to the trustee who will in turn pay Countrywide.

**C.    *Countrywide Argues that Because It has a Property Right in Rents, Supplementary to Its Lien Against Real Property, the Conventional Bankruptcy Analysis Does not Apply***

**1.    Even an absolute assignment of rents is, at best, a possessory right in the rents, with the right to apply the rents to the debt**

Countrywide contends that it "owns" the rents, and therefore it has a right to collect the rents regardless of Bankruptcy Code provisions that limit its secured claim, regardless of Bankruptcy Code provisions that terminate its deed of trust upon payment of $58,000, and regardless of Bankruptcy Code provisions that discharge its claim in excess of $58,000 plus whatever recovery Countrywide gets on its unsecured deficiency claim.

The principal reason that this argument fails is that because Countrywide's assignment of rents is a collateral interest, a security interest, not an absolute ownership right.  Although Countrywide's brief strenuously argues that the words "assign", "transfer", "absolute", and "unconditional" require the Court to conclude that the assignment of rents is an absolute assignment, that is not correct.  "All of the provisions must be considered with reference to the

whole instrument, and no single provision taken alone will be given controlling effect." *Cadle supra.*

But Countrywide's argument would have no merit even if its assignment were "absolute."  Countrywide seems to argue that an assignment of rents creates a new and unique specie of property or estate….ownership of rents from mortgaged property separate from the ownership of the property.  *FDIC v. International Property Management* effectively refutes that contention.  "Absolute assignment" of rents is a legal fiction that defines ownership of rents, as between the mortgagor and mortgagee, and is based on trust concepts.  The trust concept merely enforces the mortgagee's rights as a secured creditor; they do not separate ownership of rents from ownership of the collateral.  The rights of the mortgagee are to have the rents received in trust and applied to the indebtedness.  And even that right may not apply if rents have been collected by the mortgagor and commingled or spent, or if there is a 3rd party claim.  Countrywide has cited no authority for the proposition that rents from the Danforth Road Property are no longer property of the estate (which they would not be if ownership had transferred to Countrywide.)  Countrywide has cited no authority that it's right to apply rents to its note do not terminate when the deed of trust is canceled.

The difference between a collateral assignment of rents and an absolute assignment of rents is that an absolute assignment is self-executing and provides the mortgagee with a possessory right to the rents.  It is "absolute control" of the rents, not the creation of a new specie of ownership of an income stream.  Countrywide could not, for example, sell the future rents because its' right to them terminates when the deed of trust is canceled.

## 2. The collateral has been valued for purposes of this chapter 13 plan at $58,000, and that is the amount that Countrywide is entitled to receive under §§ 506(a) and 1325(a)(5)

In accordance with local rules, the Debtor's chapter 13 plan (docket #9) included a motion for valuation of collateral, which alleged that Countrywide's collateral was worth $58,000.  The purpose of the local rule is to give proper notice that valuation would be established at the confirmation hearing so that the Court can efficiently and effectively make determinations of the amount of secured claims under § 506 which is necessary in order to determine whether the plan satisfies statutory confirmation standards.  Countrywide did not object to the valuation and did not present any evidence at the confirmation hearing that its collateral had a value exceeding $58,000.  In fact, Countrywide's own proof of claim values its collateral at $58,000.

Confirmation of the Debtor's plan vests all property (including the Danforth Road Property) in Debtor free and clear of all claims of creditors that are provided for in the plan (Bankruptcy Code § 1327(c)) except that Countrywide retains its lien until the time the Debtor receives a discharge (Bankruptcy Code § 1325(a)(5)(B)(i)(I)(bb)).  Countrywide is clearly "provided for" in Debtor's plan.  When (and if) Debtor makes all payments called for in the plan, Debtor will receive a discharge (Bankruptcy Code § 1328), and Countrywide's debt will be discharged and its lien released.

Since the Court concludes that Countrywide's assignment of rents is a security interest, termination of the lien upon plan consummation terminates any right that Countrywide has in the rents. Until then, the plan fully accords Countrywide its rights since the payment to Countrywide under the plan exceeds the rents.

**D.      The Result that Countrywide Seems to Be Seeking**

The relief that Countrywide seems to seek is (1) a requirement that the tenant pay rents directly to Countrywide, (2) the requirement that Debtor pay Countrywide through the plan $1,120 per month <u>in addition</u> to the rents, and (3) the right to collect rents subsequent to Debtor's discharge until the entire principal and interest on the note is paid in full.

Even assuming that Countrywide's interest in rents is "absolute" and not a security interest, the Court concludes that the plan adequately satisfies Countrywide's interests on the first element. The tenant is paying Countrywide the full amount of the rents, albeit indirectly through the trustee. In fact, Countrywide obtains substantial benefit by payment through the trustee instead of payment directly from the tenant. Payment through the trustee creates a documented record of when payments to Countrywide are made and affords relief to Countrywide by dismissal of the case (and reinstatement of its entire panoply of pre-bankruptcy rights under state law) if Debtor misses a payment (regardless of whether tenant misses a payment). Countrywide is better protected by payments through the plan than by payments outside the plan. And, as *Taylor* pointed out, public policy disfavors collection of rents by the mortgagee because the mortgagor has no assurance that the mortgagee will properly collect and properly apply the payments.

With respect to Countrywide's second objective, Countrywide and Debtor agreed that the Danforth Road Property is worth $58,000. In thousands of bankruptcy hearings involving appraisal of real property, the appraisers have always stated a fundamental assumption that the interest appraised is a fee simple interest in property, subject to no limiting rights. Therefore the Court takes judicial notice that absent a stipulation of a limiting interest, the stipulated value of real property is a fee simple interest. There was no indication that the $58,000 stipulation included a consideration of any limitation on Debtor's right to rents, except as a security interest. When the Court questioned Countrywide's counsel on the valuation of the property and of the alleged separate ownership of rental rights, it was clear that no assumption was made that there was any separate ownership of rental rights that affected the valuation of the Danforth Road Property. Therefore, the Court concludes that the $58,000 valuation of the Danforth Road Property includes the value of the fee simple ownership, including the right to rents and revenues subject to the obligation to apply rents to Countrywide's claim. Based on that conclusion, and by application of Bankruptcy Code § 506(a), Countrywide is entitled to only $1,120 per month, not $1,120 plus $650 per month.

With respect to Countrywide's third objective, Countrywide has cited the Court to no authority for the proposition that an assignment of rents (even an "absolute assignment" and *a fortiori* a collateral assignment) survives discharge of the debt and revesting of property free and clear of the deed of trust.

### E.     *Countrywide's Argument Does Not Accord With Simple Financial Mathematics*

Countrywide's argument is simply an attempt at an "end run" around § 506(c) which limits Countrywide's secured claim in bankruptcy to the value of its collateral.  After having spent 20 years listening to appraisers testify that there are three approaches to value: the replacement value approach, the income approach, and the "comparables" approach, the Court can takes judicial notice that the value of the Danforth Road Property depends on whether owner of that property has the right to collect rents.  After more than 40 years of doing calculations of the present values of zero coupon bonds, Treasury Strips, annuities due, life estates, and remainder interests, the Court can also take judicial notice that if an asset that produces income is separated from the income stream it produces, two assets may be created, and that the value of each can be separately computed.  But the sum of the two values is almost always the same as the value of the asset before its income stream was separated.  There was no evidence that the Danforth Road Property is an exception from that almost universal rule.  Countrywide cannot turn lead into gold by cutting the lead into two pieces.

### F.     *Alternative Relief Requested by Countrywide*

In its memorandum of authorities (docket # 50), but not in its motion for accounting and turnover or in its objection to plan confirmation, Countrywide asks for "Alternative Relief— Cash Collateral Issues."  Countrywide notes that if its assignment of rents is not an absolute assignment, but is found to be a collateral assignment, then the rents are cash collateral which the Debtor may not use without Court permission.

> Countrywide requests this Court to confirm that the debtor is not authorized to use its cash collateral and deny confirmation of the pending chapter 13 plan. (Docket # 50, "Conclusion".)

But this request to prohibit use of cash collateral is as ambiguous as the motion for accounting and turnover and the objection to confirmation.  Countrywide's memorandum concedes that Debtor may use cash collateral with Court permission.  As noted above, Debtor is using the cash collateral (and more) to pay Countrywide's debt in accordance with the Bankruptcy Code and that payment through the trustee is more secure and beneficial for Countrywide than payment of rents directly to Countrywide.

Although the Court should not address requests for relief raised in memoranda rather than in motions, to conclude this matter, the Court will include authority for Debtor to use cash collateral in its order denying Countrywide's motion for accounting and turnover.

## IV     Debtor's Plan is Confirmed

Because Countrywide's objection is without merit and because the Court concludes that Debtor's chapter 13 plan meets the requirements of § 1325 of the Bankruptcy Code, Countrywide's objection is overruled, and the plan is confirmed by separate order issued this date.

**V.      Countrywide's Motion is Denied**

By separate order issued this date, Countrywide's motion for accounting and turnover is denied.

**VI.     Award of Sanctions Reserved**

The Court reserves to a separate opinion the award of Rule 9011 sanctions against Counsel for Countrywide.

SIGNED    December 20, 2006

_Wesley W. Steen_

_____
WESLEY W. STEEN
UNITED STATES BANKRUPTCY JUDGE