

ENTERED
06/18/2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | | |
| JAMES PATRICK ALLEN | § | CASE NO: 06-60121 |
| Debtor(s) | § | |
| | § | CHAPTER 13 |

**MEMORANDUM OPINION**
**CONCERNING NATURE AND AMOUNT OF SANCTIONS**

On January 9, 2007, the Court issued a memorandum concluding that Barrett Burke Wilson Castle Daffin & Frappier, L.L.P. ("Barrett Burke") had violated rule 9011 of the Federal Rules of Bankruptcy Procedure (FRBP) in this case. The memorandum also concluded that Barrett Burke had failed to send the attorney in charge (or a fully authorized and informed attorney) to hearings.[1] The particulars are set forth in the memorandum opinion. By order issued concurrently with the memorandum, the Court set a hearing to determine the nature and amount of sanctions. For reasons set forth below, and by separate order issued this date, the Court imposes sanctions of $75,000.

## I. BACKGROUND

The prior opinion, docket number 62, sets out, in detail, the conduct that the Court finds to be sanctionable. Barrett Burke does not contest the Court's findings or conclusions:

> The Barrett Burke law firm does not contest the validity or accuracy of this Court's findings as it relates to the mistakes and the issues relating to the mistakes.
>
> Those mistakes, indeed, were egregious and are acknowledged and full responsibility is taken…
>
> Nothing excuses the actions in this case…[2]

Because those findings and conclusions have been previously set out in writing and are uncontested, the Court will not repeat them here. The prior memorandum opinion is incorporated by reference.

In that prior memorandum opinion, the Court referenced prior warnings and sanctions that had been issued to Barrett Burke. The Court set a hearing on March 22 to determine what

[1] Local Rule 11.2 of the local rules of the United States District Court for the Southern District of Texas states: "LR11.2 **Responsibility.** The attorney-in-charge is responsible in that action for the party. That individual attorney shall attend all court proceedings or send a fully informed attorney with authority to bind the client." District Court local rules are applicable in the bankruptcy court by virtue of bankruptcy local rule (BLR) 1001(b).

[2] Transcript from March 22 hearing p. 10 ln. 6-14, p. 12 ln. 15.

nature and amount of sanctions were necessary to deter future inappropriate conduct. The March 22 hearing was continued and was concluded on May 11. This memorandum opinion will address only the issues that must be addressed with respect to the amount and nature of sanctions that should be imposed.[3]

## II. *TOPALIAN V. EHRMAN*, 3 F.3D 931 (5TH CIR. 1993)

*Topalian* establishes that a court must answer four specific questions when imposing sanctions:

1. What conduct is being punished or is sought to be deterred by the sanction?
2. What expenses or costs were caused by the violation of the rule?
3. Were the costs or expenses "reasonable" as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention?
4. Was the sanction the least severe sanction adequate to achieve the purpose of the rule under which it was imposed?

## III. APPLICATION OF THE *TOPALIAN* FACTORS

A. What conduct is being punished or is sought to be deterred by the sanction?

The conduct that is being punished is set out in great detail in the prior memorandum opinion, about which Barrett Burke has no quarrel.

The conduct that is sought to be deterred is the filing of pleadings with the court that are clearly wrong (even contrary to the information in Barrett Burke's own files) or that otherwise are not thoughtful, considered, and intelligible. Further, the Court seeks to discourage Barrett Burke from failing to attend hearings that have been set on its motions and from making token appearances in other hearings through local counsel who are so ill-informed that they actually misinform the Court.

B. What expenses or costs were caused by the violation of the rule?

The expenses or costs were the time and efforts of Debtor's counsel, the chapter 13 trustee, and the Court (i) reviewing and responding to pleadings that were meaningless; (ii) reviewing and responding to a pleading that purported to be a "withdrawal" of the first offensive pleading but was in fact more meaningless than the pleading it withdrew; (iii) preparing for and attending a hearing that was unnecessary; (iv) continuing a hearing based on incorrect representations to the Court; (v) having to continue the second hearing because Barrett Burke

[3] A substantial part, perhaps the majority, of Barrett Burke's presentation at the May 11 hearing was the contention that the firm's reputation and relationship with clients had been damaged by the Court's written conclusion that Barrett Burke's conduct was egregious. Even though the word "egregious" is the word chosen by counsel for Barrett Burke, counsel earnestly and forcefully asked the Court to avoid strong statements and forceful analysis in this memorandum because such language might exacerbate the perceived harm. The Court will honor that request, to the extent possible. The analysis in this memorandum is minimalist. However, counsel for Barrett Burke also made it clear that, to justify the sanctions imposed, the Court must make the findings required by the Fifth Circuit. The line between (i) sufficient explanation to explain the Court's reasoning and (ii) minimal adverse statements is a difficult line to walk.

was not prepared for trial; (vi) conducting a final hearing that was equally unnecessary, and (vii) delaying confirmation of Debtor's chapter 13 plan. The details are found in the Court's prior memorandum opinion.

Determination of the amount of these expenses and costs is not possible. There are simply no records to compute the Trustee's costs or the value of the Court's time, for example. Having spent more than 13 years presiding over chapter 13 fee applications and being generally aware of the costs and expenses of litigation, the Court estimates that the actual costs and expenses of Debtor's counsel alone substantially exceed $5,000.[4] The cost of the efforts of the chapter 13 trustee and the Court are at least twice that. Therefore a very, very conservative estimate would be $15,000.

C. Were the costs or expenses "reasonable" as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention?

There is no justification for these costs. Barrett Burke concedes that there is no excuse for its conduct.

D. What is the least severe sanction adequate to achieve the purpose of the rule?

As the US Trustee points out:[5] "The Advisory Committee Notes to the 1993 Amendments to Rule 11 provide a non-exhaustive list of factors that the Court may consider in determining the appropriate type and amount of sanction. They include, *inter alia*: a) whether the improper conduct was part of a pattern of activity or an isolated event; b) whether the person has engaged in similar conduct in other litigation; c) what effect the improper conduct had on the litigation; d) whether the responsible person is trained in the law; and e) what amount of monetary sanctions, given the financial resources of the offending party, will be sufficient to deter a repetition of similar conduct."[6]

The impact of the improper conduct has been addressed above. The remaining factors will be treated below.

---

[4] Barrett Burke has offered to pay the expenses of Debtor's counsel. Based on statements in open court, the Court believes that this matter has been resolved. The number is estimated solely to give an order of magnitude to the costs to one of the three parties involved.

[5] Barrett Burke has complained bitterly about the participation of the US Trustee in this matter. The US Trustee is a party in interest with the authority to be heard on any matter (11 U.S.C. § 307). The US Trustee participated in this hearing in his capacity as a party in interest at the request of the Court. His participation assured presentation of a complete factual and legal case. Courts do not function well when only one side of an issue is presented. A party is not likely to present enthusiastically or completely the authorities, argument, and evidence that do not support his or her position, and is not likely to cross-examine his or her own witnesses. The judicial system requires an adversarial presentation. The US Trustee provided an invaluable benefit to the case and to the process by his professional participation.

[6] Statement of the US Trustee, docket # 77, page 26. *See also* the authority cited the US Trustee in footnote 15 of the referenced statement.

1. Whether the improper conduct was part of a pattern of activity or an isolated event, and whether the law firm has engaged in similar conduct in other litigation—these factors are addressed together[7]

The Court has examined a number of similar incidents involving Barrett Burke over the past four years. The Court concludes that the improper conduct was part of a pattern of activity and that Barrett Burke has been warned numerous times to correct its deficiencies.

a. *In re Thompson*, Case No. 01-10399 (Bankr. N.D. Tex. 2003)

Barrett Burke filed a motion for relief from stay on behalf of CitiFinancial Mortgage Company asserting that the debtors had defaulted on four post petition payments. The response filed by the debtors asserted the motion was filed in bad faith because all payments were current, the home was insured, and no grounds existed to warrant relief.

At the hearing on the motion, no argument or evidence was offered in support of the motion. The Court allowed additional time to present evidence, but Barrett Burke presented none. The Court found that Barrett Burke had violated its duty by failing to verify the factual basis for the motion, or by failing to withdraw the motion when apprised of Debtor's position. The Court imposed sanctions of $2,500 plus $575 for attorney's fees and expenses. Barrett Burke and CitiFinancial were held jointly and severally liable for the total amount.

The Court sees similarity in that no evidence was offered at the hearing on Barrett Burke's motion, despite the court allowing additional time. Further, Barrett Burke failed to take appropriate steps to resolve the matter; Barrett Burke failed to support or to withdraw the motion after filing it.

b. *In re Davis*, Case No. 02-10389 (Bankr. N.D. Tex. 2003)

Barrett Burke filed a motion for relief from stay on behalf of Wells Fargo Home Mortgage Inc. At the hearing, the parties advised the Court that they had reached an agreement and that Barrett Burke would upload an agreed order. The order was uploaded and was entered June 27, 2003; but the order that Barrett Burke uploaded was materially different from the form of order that had been agreed by the parties. The debtor's attorney contacted Barrett Burke by letter, advising that the order submitted to the court was substantially different from the agreed order. Barrett Burke told debtor's counsel that a corrected order would be submitted. Despite that assurance, Barrett Burke took no action to correct the order until debtor's counsel filed a motion to vacate the order and for sanctions.

Barrett Burke contended that uploading the incorrect form of order was an honest mistake that was compounded by Barrett Burke's further mistake in failing to submit timely a corrected order. No explanation was given as to how the mistake was made. The Court concluded that the changes to the order were intentional; and Barrett Burke's failure to cure the problem reflected a cavalier attitude toward the situation or a failure to implement internal procedures that insure that

[7] The Court has looked to the original pleadings, orders and transcripts where available to expand upon the summaries offered by Barrett Burke.

any such mistakes are corrected.  Finding bad faith, the Court allowed debtor's attorneys fees and costs of $3,500 and an additional sanction of $2,500.

The Court sees similarities in that Barrett Burke filed an incorrect form of order and failed, even after notice, to correct the error timely.

        c.       *In re Smith*, Case No. 04-41212 (Bankr. S.D. Tex. 2004)

Barrett Burke filed a motion for relief from stay on behalf of Suntrust Mortgage, Inc. The motion alleged that the debtors were delinquent on four payments and that debtor had no equity in the property that secured a note in the original amount of $27,700, docket # 14.  On October 25, Barrett Burke filed a motion to amend, alleging a $221,900 note instead of a $27,000 note, docket #17.

On October 29, Barrett Burke filed a second motion for relief from stay on the same property, alleging the same principal amount that was in the first motion for relief from stay, $27,700, docket #19.  The motion and the exhibit summary are substantively identical to the ones filed October 4.  Barrett Burke withdrew the October 29 motion at hearing on November 22.

On November 24, Barrett Burke filed a motion for approval of an agreement lifting the stay on the same property.  On December 18, 2004, the Court ordered Barrett Burke to appear and to explain the four motions (one amended) on the one piece of property.

At the hearing, counsel explained that the series of motions were meant to address a first and second lien on the same property.  There was no explanation in the motions that would have allowed the debtor, the Court, or anyone else to understand that.  No note or other documentation was attached to the motions that would have made this clear.  Counsel explained that the first motion was incorrectly filed for the second lien instead of the first lien.  The second motion was filed to correct the first motion.  The third motion was for the second lien.  This had confused Barrett Burke's case manager, a paralegal, causing the third motion to be withdrawn by accident under the belief it was a duplicate motion.

That explanation suggested that pleadings were being drafted by computer and managed by paralegals, without adequate professional oversight and review, or that Barrett Burke's pleadings were meaningless boilerplate.  The Court expressed its concern over the confusing pleadings.  The Court emphasized the importance of assuring that "the motion makes sense on its face and that the Court can understand what's going on in a case and it doesn't have to, sort of, try to put it all together."[8]

The Court sees similarities to the conduct in the case at bar since it demonstrates a pattern of conduct of filing pleadings that are confusing at best and meaningless at worst.  The Court did not impose sanctions in this case, but suggested that Barrett Burke improve its pleadings.

---

[8] Case No. 04-41212, Doc. # 104, p. 6, ln. 10-12.

        d.      *In re Cordova*, Case No. 04-50312 (Bankr. S.D. Tex. 2005)

Barrett Burke filed a motion for relief from stay on behalf of Litton Loan Servicing, LP alleging that the debtors had defaulted on four payments. When the motion was filed, Litton was the servicing agent for the debtor's mortgage held by JP Morgan Chase Bank. Litton's motion was called for hearing on January 12, 2005. Local counsel on behalf of Barrett Burke asked for a continuance, stating that the loan servicing agent had changed and therefore Litton did not have complete and accurate data concerning the loan arrearage.[9] Concerned about how a motion could be filed without adequate records, the Court issued an order to show cause why sanctions were not appropriate, noting that the motion was essentially boilerplate and lacked thoughtful drafting. The court also noted that the motion alleged that supporting documents were attached, which was false. The Court noted that it had noted similar issues in other pleadings filed by Barrett Burke.[10]

At the hearing on February 3, Barrett Burke reported that it had originally prepared the motion on representations by Litton which counsel accepted as true, and therefore Rule 9011 sanctions against counsel were not appropriate. Counsel also reported that the loan servicing duties had been transferred not just once, but twice, and that counsel had no relationship with the new servicing agent and therefore could not appear before the Court on the motion.

This statement to the Court differed materially from the statement made by local counsel who appeared for Barrett Burke at the initial hearing. Local counsel had said that a continuance was needed because Litton did not have complete and accurate data. In fact, the problem was that Litton had abandoned the matter (because it was no longer the servicer), and Barrett Burke was trying to make arrangements with the new servicer to allow Barrett Burke to continue with the engagement for this new client. At the second hearing, Barrett Burke took the position that it could not proceed with the matter because it had no client.

The Court stressed to counsel the importance of treating the Court with dignity and not abandoning pleadings, especially after asking for a continuance. The Court then issued an order for hearing on sanctions against Litton and the holder of the note.

At the hearing on March 2, Litton testified about the transfer of the loan. The Court stressed that appearing in federal court was not a trivial matter and that once a party had filed a pleading, it was not appropriate simply to disappear. The Court did not impose sanctions but did warn that it would take stronger action if parties did not act appropriately before the Court.

The Court sees similarities to the case at bar because Barrett Burke appeared in court through local counsel who was inadequately informed, who was not fully authorized, and who asked for a continuance on representations that ultimately proved to be not correct. The Court did not impose sanctions, but tried to provide guidance to counsel and to give counsel an opportunity to comply in the future.

---

[9] Case No. 04-50312, Doc. # 45.

[10] *Gaytan*, *infra*, occurred at the same time as *Cordova*.

e.      *In re Gaytan*, Case No. 04-50242 (Bankr. S.D. Tex. 2005)

Barrett Burke filed a motion to lift the automatic stay on behalf of Wells Fargo Bank, N.A. The motion alleged that the debtors were delinquent on five payments. The debtors filed a response alleging that they were current on the mortgage. The debtors attached a payment history they had received from Wells Fargo as well as a payment history that was downloaded from Wells Fargo's website. Barrett Burke did not file a rejoinder, nor did it appear at the hearing. Debtors' counsel appeared at the hearing and explained to the Court that he had been in communication with Barrett Burke regarding the payment discrepancies in the motion.

The Court issued an order to show cause why sanctions should not be imposed, stating that seven factors raised substantial concern about whether Barrett Burke had prepared the motion for relief from the stay with sufficient care and that the quality of the pleading raised substantial concerns about Barrett Burke's practice before the court: (i) the motion is largely boilerplate, (ii) the motion obviously contained typographical errors, (iii) the allegations of the motion appeared to be contrary to Wells Fargo's own documents relating to payments, (iv) Wells Fargo and Barrett Burke had not responded to the allegations in Debtors' response indicating that payments were current and Barrett Burke had not appeared at the hearing on its motion, (v) the motion alleged lack of insurance, but the debtors filed a response indicating that insurance was in place from February 2004 through February 2005, (vi) the motion alleged that there was no equity in the collateral and that Wells Fargo was not adequately protected, but the allegation appeared to be mere boilerplate, not thoughtful pleading, and (vii) the motion alleged that copies of the note and deed of trust were attached, but they were not.

Barrett Burke filed a response asserting that it had relied on its client's records. Wells Fargo filed its response requesting the Court allow it to withdraw its motion. At the February 3 hearing, the Court allowed Barrett Burke to orally withdraw the motion. Barrett Burke reported that Wells Fargo had settled the debtor's request for sanctions by agreeing to pay $1,500. Barrett Burke explained to the Court that they filed the pleading based on information in the referrals that clients give to them; they did not have access to the client's records. Wells Fargo allegedly had given Barrett Burke a flawed referral that had not been reconciled. Barrett Burke stated that it did not attend the hearing because it had brought the problem to Wells Fargo's attention but had not received a response prior to the scheduled hearing date.

The Court stated on the record that it was not convinced that the quality of the pleadings was adequate. The Court stressed that pleadings need to be accurate, thoughtful, and carefully reviewed before they are filed. Because the matter was settled, the Court decided to pursue no further action except to require Barrett Burke's managing partner to read the transcript of the hearing and to file a statement into the record confirming that the transcript had been read and that the firm's efforts in filing motions to lift the stay would be improved in the future.[11] Barrett Burke filed its statement on February 28, 2005, signed by Mary Daffin.

---

[11] Wells Fargo was also ordered to read the transcript and file a similar statement. Wells Fargo filed a statement with the Court acknowledging the error it made regarding the referral of the loan for a motion for relief from stay and the information contained in the referral.

The Court sees similarities to the case at bar not so much in that the initial pleadings were obviously seriously defective but in that Barrett Burke failed to correct the confusion prior to the hearing and even failed to appear at the hearing on its motion. The failure to appear at a hearing is not excused by the failure to receive a reply from the client. The case, again, demonstrates that warnings were provided; sanctions were not immediately imposed.

      f.    *In re Anderson*, Case No. 05-30161, 330 B.R. 180 (Bankr. S.D. Tex. 2005)

On February 22, 2005, a proof of claim was filed on behalf of CitiFinancial Mortgage Company. The proof of claim asserted that the claim was secured, but no documentation was attached to the proof of claim as required by FRBP 3001.[12] On May 24, 2005, Debtor's counsel objected to the proof of claim and served a copy of the objection and notice of hearing on CitiFinancial at the address listed in the proof of claim. On June 16, 2005, Barrett Burke filed an objection to confirmation of the chapter 13 plan on behalf of CitiFinancial.[13]

An attorney from Barrett Burke made an appearance at the confirmation hearing on behalf of another client, but Barrett Burke did not make an appearance to prosecute the objection to plan confirmation that Barrett Burke had filed on behalf of CitiFinanicial and the attorney for Barrett Burke who was present at the hearing on behalf of another client did not prosecute that objection. Nor did Barrett Burke file a timely response to Debtor's objection to the CitiFinancial claim or make an appearance at the hearing in response to that objection. The Court issued an order disallowing the claim.

Barrett Burke then filed a response to the objection on June 23, three days after the hearing and after the Court had signed an order disallowing the claim. Barrett Burke also filed a Motion to Vacate the Court's order. At the hearing on the Motion to Vacate Barrett Burke presented oral argument about the nature of CitiFinancial's alleged lien and about the equities of the situation, but Barrett Burke failed to introduce any evidence into the record concerning why its attorney failed to represent CitiFinancial at the June 20 hearing. Nor did Barrett Burke present any evidence concerning why documentation was not attached to CitiFinancial's claim. Judge Bohm denied the Motion to Vacate. No sanction was imposed, although the Court expressed its concerns in a memorandum opinion.

The Court sees similarities to the case at bar in failure to appear before the court at hearings on pleadings that Barrett Burke has itself filed.

      g.    *In re Clansy*, Case No. 04-40504 (Bankr. S.D. Tex. 2005)

Barrett Burke filed a motion for relief from stay on behalf of Washington Mutual Bank alleging that, through the Month of October, 2005, the debtors were one payment delinquent in

---

    [12] Although the record does not indicate that Barrett Burke prepared the proof of claim, in a number of hearings in other cases Barrett Burke has testified that it regularly prepares the proofs of claim for clients but has clients sign the proof of claim. In any event, Barrett Burke did file an objection to plan confirmation on behalf of CitiFinancial as indicated below.
    [13] Docket # 24.

payment of a secured claim.[14] About two weeks later, Barrett Burke filed an amended motion that was virtually identical with the first, except that it alleged that debtors were four payments delinquent through October, 2005. The debtors filed a response asserting they had paid all post-petition payments and had commitments to refinance the subject real property. At hearing on November 22, Barrett Burke presented no documents and called no witnesses in support of the motion. Barrett Burke requested a continuance on the grounds that its client had not provided requested documentation. The motion was dismissed with prejudice for sixty days.

The Court issued an order for Washington Mutual and its counsel to show cause why sanctions should not be imposed, expressing concern that the allegations of the motion were without factual basis.

At the hearing on December 6, an attorney from Barrett Burke testified that he had made a mistake in entering information into the system that generates the forms. He further stated that contrary to his prior representation to the court, he had indeed received a payment history from the client prior to filing the motion, and that the debtors had failed to make 2 payments:[15] August and September 2004. Judge Bohm found the pleadings to be confusing and misleading. He requested on the record that Barrett Burke draft its pleadings more precisely. Although he concluded that the error was not deliberate, he warned Barrett Burke to be more careful in its drafting. No sanctions were pursued.

The similarity with the case at bar is that Barrett Burke filed pleadings that were not only confusing and incorrect, they were contrary to the information in Barrett Burke's own file. In addition, the reason given for requesting a continuance was simply wrong. Finally, like the case at bar, the testimony was that the two erroneous motions were filed because data was incorrectly entered into a computer system, suggesting that somehow that attorneys have limited authority for the form of the pleadings. The testimony suggests that the computer system produces pleadings from the data that is entered.[16] The Court's warning was the only consequence to Barrett Burke.

h. *In re Porcheddu*, Case No. 05-40177, 338 B.R. 729 (Bankr. S.D. Tex. 2006)

Barrett Burke filed a motion for relief from stay on behalf of Chase Home Finance, LLC. At hearing on October 21, a Barrett Burke attorney testified in support of attorney fees requested by Barrett Burke. The attorney testified that the proffered fee statements were contemporaneous business records, that said attorney was the custodian of the records, and that time entries were made on a contemporaneous basis. Barrett Burke later acknowledged that all of the testimony was wrong. The fee statements were not business records of Barrett Burke; they were prepared in anticipation of litigation. The attorney was not the custodian for the records and had no idea how the records were maintained, and the time entries were not maintained on a contemporaneous basis. Barrett Burke never admitted to any wrong-doing in *Porcheddu*. The

[14] Docket # 233.

[15] Not one, as stated in the first motion, or four as stated in the amended motion.

[16] This is very similar to the testimony in the case at bar concerning the initial pleading that Barrett Burke filed in this case. *See* the Court's prior memorandum opinion.

Court noted "Barrett Burke recognizes the seriousness of this Court's show cause order. But what is most puzzling to the Court is that Barrett Burke fails to appreciate what is wrong with the approach they have taken and how fundamentally it distorts our adversarial system." *In re Porcheddu*, 338 B.R. 729, 737 (Bankr. S.D. Tex. 2006). The Court concluded that a sanction of $65,000 against Barrett Burke and $1000 against the individual attorney was an appropriate sanction.

The activity addressed in *Porcheddu* occurred in late 2005. The opinion was issued in February 2006. Barrett Burke has testified that it began investing money in its Default.Net custom software shortly thereafter. Barrett Burke also hired Ms. Marilee Madan as head of the bankruptcy attorneys in the firm, directly responsible for supervising those attorneys and resolving difficult problems. Ms. Madan began working with the firm in April. The conduct for which sanctions are imposed in this memorandum occurred over a period of time, commencing at least six months later.

2. Whether the responsible person is trained in the law

Barrett Burke is a law firm with 400 employees, about 35 to 40 of whom are attorneys. Barrett Burke is trained in the law.

3. What amount of monetary sanctions, given the financial resources of the offending party, will be sufficient to deter a repetition of similar conduct

a. Barrett Burke's contentions

Counsel for Barrett Burke, and Mary Daffin (Barrett Burke's managing partner) assure the Court that Barrett Burke "gets it".

> "The point is loud and clear."[17]

The essence of Barrett Burke's presentation is that they have undertaken substantial corrective action, and therefore punitive measures are not necessary.

*i. Quality Control*

Ms. Daffin testified that Barrett Burke began looking at supervisory controls prior to the order issued in *Porcheddu.* She hired Ms. Marilee Madan in March 2006 who began work about April 1 as the "managing bankruptcy attorney." Ms. Madan's compensation package is $500,000. Ms. Madan is in charge of day to day decisions, supervises attorneys, and provides training to attorneys (including bringing in training from outside of the firm).

Ms. Daffin estimates that Barrett Burke files 25,000 - 30,000 pleadings per year consisting of proofs of claim, motions to lift stay, objections to confirmation, and responses to contested matters. The process is electronic and contains multiple layers of security. The electronic file contains documents from the client such as the referral, loan documents, note,

[17] Transcript from March 22 hearing, p. 12, ln. 11-12.

deed of trust, payment history and any assignments of note or deed of trust. The file also has the debtor's schedules, petition, plan and any correspondence from Barrett Burke. To prepare pleadings, an attorney first reviews the file, looks at the documents, and determines whether the client's objectives are appropriate. After that review, there is a second level, to verify accuracy (described in more detail below). Barrett Burke uses a proprietary software system, Default.Net, that is personalized to each attorney who uses it. Since February 2006 Barrett Burke has invested $296,000 to improve its system.[18]

*ii. Payment Application and Claims Tracking ("PACT")*

Barrett Burke initiated dialogues between the members of the mortgage banking industry, major loan servicers, and others about trying to work together to track note payments on notes in bankruptcy cases. Barrett Burke testified that this task is made more complicated because each chapter 13 trustee uses a different system to make payments. These discussions led Barrett Burke to develop PACT, an electronic system to track payments and claims. Barrett Burke is the only firm that has invested money to develop PACT. The investment to date exceeds $900,000. Ms. Daffin expects phase two of PACT to cost $2 million. Ms. Daffin testified there are no current plans to market the PACT program, but the firm has not closed the door to marketing the program as a separate source of revenue.

*iii. Post-Allen Initiatives*

Barrett Burke testified that it has implemented the following changes to its processes.

Final Attorney Document Review – Each attorney must make one final review of a document to ensure accuracy. The attorney must certify within the system that he or she has completed this review. The system rejects the document that the attorney produces unless this documentation is made.

Objections to Confirmation – An attorney must review the debtor's plan and schedules, prepare a proof of claim, and prepare a plan review sheet. A second attorney reviews the plan and objection, and decides whether to object to the plan.

Recruiting New Positions – Barrett Burke is recruiting for a head of their new "objections to confirmation unit" and a hearing coordinator. Barrett Burke has also brought in a new executive to provide a business perspective.

"Brister Initiative" – Barrett Burke has employed Bill Brister, a former bankruptcy judge, as an independent auditor to examine Barrett Burke's bankruptcy processing. A preliminary report has been prepared by the auditor and reviewed by the Court.[19]

Training and Firm-imposed CLE – In addition to CLE required by the State Bar of Texas, Barrett Burke offers training through Ms. Madan every two weeks. This oral training is supplemented by a computer system designed to improve retention of the training. Separate

[18] *Id.* at p. 38.
[19] Document #109.

modules of training are designed for the attorneys and non-attorney staff. Barrett Burke began this training after *Porcheddu* but has emphasized it after the case at bar. The cost to the firm is $575 per employee for the license and $1,250 per module. The cost for 2006 was $110,000 but is expected to increase due to development of additional modules. Ms. Madan is also responsible for bringing in additional training by people not associated with the firm.

Client Affidavits – The Bankruptcy Court for the Southern District of Texas is unique in that it is the only district that has not required attorneys to have their clients sign affidavits concerning their records that support various motions. Out of an abundance of caution, Barrett Burke will now require affidavits of all clients.

Supervision – New attorneys are being recruited for supervision. Certain complex matters will not be filed without Ms. Madan's approval.

Withdrawal – Withdrawal of a pleading will require approval by Ms. Daffin and must be accompanied by specific language as to the circumstances and the reason for the withdrawal.

Termination of Attorneys – Barrett Burke has terminated the employment of two attorneys.

b. Are Barrett Burke's efforts adequate?

It is clear that Barrett Burke is focused on its problems and is making substantial efforts to resolve them. The Court has every hope that those efforts will be successful. Because of these efforts, the Court has substantially reduced its initial estimate of the quantum of sanctions that might be necessary to deter future repetition of the practices set out above. Nevertheless, the Court believes that some substantial sanction is required for that purpose.

First, as indicated above, Barrett Burke had numerous warnings prior to the imposition (at least in this district) of monetary sanctions. Yet by Barrett Burke's own testimony, it did not undertake substantial effort until the substantial monetary sanction in *Porcheddu*. Second, Barrett Burke seems to continue to focus on checklists and decision-trees as the solution of the problems, and ignores the fact that there is simply no substitute for a thoughtful, conscientious attorney reading a pleading and asking whether a pleading makes sense; there is no substitute for correcting errors timely after they occur, and there is no excuse for failing to provide well-informed attorneys at hearings on the motions that Barrett Burke files.[20] The attorneys must be fully authorized to represent the client and to provide correct information to the court. The purpose of the sanctions imposed by the Court in this memorandum is to make that point, as *Porcheddu* made a different point.

*i. The testimony*

Barrett Burke estimates its hard costs alone at $2 million, post-*Porcheddu.* But, as the US Trustee pointed out, this testimony is exaggerated.

---

[20] *See* footnote 1 above.

First, Ms. Daffin's testimony did not give adequate breakdown of these costs. She remembered many of the large numbers, but she did not adequately explain which of these expenses were expenditures routinely incurred in the practice of law (such as software costs or CLE expenses) and what expenses were directly attributable to corrective action. In addition, it was clear that the cost of developing PACT software (almost half of the expenditures) is an independent project, possibly with independent profit potential through sale/license to other entities. PACT is irrelevant to what happened in the case at bar. Ms. Madan testified that it would not have prevented what happened in this case.

Ms. Madan was hired more than five months prior to Barrett Burke filing its initial pleading in the case at bar. And she was clearly on board in a supervisory position when the error was made, when the error was not corrected, and when a grossly incorrect "withdrawal" was filed. She was firmly in place when Barrett Burke failed to send informed and authorized attorneys to the hearing, even after a problem had been identified. The problem in the case at bar festered for months after Barrett Burke filed the initial pleading, and there was plenty of time, and warning by the Court on the record, for supervisory counsel to confront and to correct the situation. Walter Thurmond, another supervisory attorney at Barrett Burke, was aware of the situation in detail. The supervisory structure does not seem to have addressed the situation.

While the absolute dollar amount of Barrett Burke expenditures is not convincing, Ms. Daffin and Ms. Madan were obviously sincere in their statements of their recognition of a serious problem and their intent to address it.

Barrett Burke's efforts to date are oriented toward checklists and levels of security for mass production of pleadings. In their testimony, Ms. Daffin and Ms. Madan discussed decision protocols and certifications that an attorney must make to the law firm before filing a pleading. The checklist[21] for filing a motion for relief from the stay, for example, has about 57 items that the filing attorney must address before filing a motion to lift stay. Nowhere in the checklist is the attorney required to read the motion and to ask himself or herself whether the motion (as written) makes sense or whether it accurately reflects the facts and law. While the checklist asks the attorney to double-check and to certify that the numbers in the pleading are right, it does not ask the attorney to consider whether the pleading makes sense. In other words, nowhere is the attorney required to "stop and think"[22] before filing a pleading.

The checklists and the firm's orientation, as Ms. Madan's testimony indicates, are oriented around decision-making. They have little or no reference to drafting pleadings that convey information or that simply make sense. The US Trustee's cross examination suggested that the pleadings are "rough drafted" by computer or by paralegal for review by attorneys. That seems to comport with the evidence at the hearing in Victoria in which Ms. Sanov testified that she filed a meaningless pleading because she entered the wrong computer code. It also comports with the testimony in *Clansy, supra*, in which Barrett Burke explained defective pleadings by stating that data had been incorrectly entered into the computer that generates the forms.

[21] Barrett Burke Exhibit 9.

[22] "As stated by the Advisory Committee Note to Rule 11, a lawyer is required to " 'stop-and-think' before... making legal or factual contentions." *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255 (5th Cir. 2007).

Checklists and decision trees do not address whether a pleading makes sense in context and whether it communicates the firm's position to opposing counsel and to the Court. No checklist or decision protocol will replace the judgment of a conscientious attorney who simply reads the pleading and asks whether it makes sense.

ii. *In re Gomez*, Case No. 06-50239 (Bankr. S.D. Tex. 2007)

The hearing on the amount and nature of sanctions in the case at bar was March 22, 2007, over a year after *Porcheddu*. At that March 22 hearing, Ms. Daffin and Ms. Madan testified about the corrective actions that had been taken to assure that the problem in this case would not recur.

In *Gomez,* on February 28, three weeks prior to Ms. Daffin's and Ms. Madan's testimony. Barrett Burke filed a motion to lift stay on behalf of America's Servicing Company. Barrett Burke amended the motion on March 26, four days after Ms. Daffin's and Ms. Madan's testimony. The initial motion stated that Debtor was delinquent on post-petition note payments in the amount of $1,748. The amended motion stated that the post-petition delinquency was $5,881. At the hearing, local counsel appeared on behalf of Barrett Burke and reported that a continuance was necessary because the creditor had initially believed the debtor was three payments delinquent, but later discovered the debtor was nine payments delinquent. Virtually none of that was correct.

When it was all straightened out, at a hearing on April 26, the Court learned that the Debtor was indeed delinquent for post-petition payments of $1,748, but that there were pre-petition defaults on taxes and/or other charges that increased the deficiency. The statement, made by local counsel in open court that the debtor was delinquent for nine post-petition payments instead of three was obviously incorrect; the error was obvious, because the debtor had only been in bankruptcy for five months and could not possibly have been delinquent for nine monthly payments. Barrett Burke vigorously asserts that it bears no blame for the confusing pleading in *Gomez* because the problem was caused by the Court's confusing form. Even if that were correct,[23] the fact remains that Barrett Burke sent local counsel to a hearing without adequate information and authority and, through local counsel, asked for a continuance on allegations that have no basis in fact.

*iii. Conclusion—Barrett Burke has made a good start*

The Court agrees that Barrett Burke has made extensive efforts and has expended substantial sums. But the Court cannot conclude, as Barrett Burke suggests, that no sanctions are necessary to deter future violations of the rules. Barrett Burke has simply had too many warnings and has promised improvement before.

[23] While the Court agrees that the form could be improved, the central point remains. Counsel should have read the pleading, and if it did not make sense in context, should have availed himself of the provision in the local rules to submit a "nonstandard" motion. Obviously counsel knew how to do this, since he actually asked for a variance with respect to paragraph 1 of the form. *See* the Court's memorandum, docket # 63. Counsel is not credible when he acknowledges that he knew how to ask for a variance from local procedures with respect to paragraph 1 but failed to be accurate in paragraphs 11 and 12 because the form made him do it. See docket # 63 in case # 06-50239 for more detail.

Therefore the Court looks to the factors that it must address to determine the amount of sanctions.

c. Barrett Burke's Financial Resources

One of the factors that the Court must consider is the magnitude of the attorney's financial resources. The US Trustee asked for discovery that would include Barrett Burke's financial statements. Barrett Burke aggressively resisted that discovery, and the Court acceded to Barrett Burke's position to avoid causing Barrett Burke any more distress than was absolutely necessary. Barrett Burke argued long and hard that the Court's earlier memorandum opinion had caused Barrett Burke great difficulty in relations with its clients and with relationships in the bar. Mr. Thomas testified that the bar had viewed the opinion as "Schadenfreude" or "the gleeful joy at the misfortune of others." The Court spared Barrett Burke an extensive and public disclosure of its finances. But there is considerable evidence on the record that would sustain a conclusion that Barrett Burke's financial resources are quite substantial.

Barrett Burke testified that it has 400 employees, and Barrett Burke's counsel stated that between 35 and 40 of those employees are attorneys. Counsel did not state how many of those are partners and how many are staff attorneys. The compensation package for Ms. Madan, supervisor of the bankruptcy attorneys, is $500,000 per year. Barrett Burke files 25,000 to 30,000 pleadings per year. The Court allows $650 as reasonable compensation for the most common of those pleadings, motions to lift stay. If one assumes that Barrett Burke averages about $387 per pleading, then its gross income from bankruptcy pleadings alone is between $9,675,000 and $11,610,000.[24] Counsel for Barrett Burke has steadfastly maintained, and Ms. Daffin generally substantiated, that Barrett Burke has spent over $2 million in the past year on computer programs, continuing education, related employee training, and Ms. Madan's compensation package.

## IV. CONCLUSION

There is no objective or scientific way to determine the nature of sanctions that should be imposed or to calculate the amount of sanctions that should be imposed.

Barrett Burke's testimony indicated that *Porcheddu* was the seminal event in its efforts to address deficiencies in its practice. But the discussion above establishes that Barrett Burke had been warned many times, prior to *Porcheddu*, about problems in its practice. Barrett Burke did

[24] The Court notes that Barrett Burke was receiving $125 for filing proofs of claim in 2002. *In re Slick*, Case No. 98-14378, Adv. 99-1136, 2002 Bankr. LEXIS 772 (Bankr. S.D. Ala. 2002). (Presumably that figure has increased substantially in the past 5 years.) So the Court concludes that the least expensive of these pleadings probably produces substantially more than $125. The Court in other matters has determined that $650 is a reasonable fee for filing motions to lift stay (the most common pleading of those that Ms. Daffin included in the 30,000 annual pleadings). The average of $650 and $125 is $387.50. Although the Court would be highly surprised if Barrett Burke does not receive more than an average of $387 for the 30,000 pleadings it files annually, the Court will use that figure because Barrett Burke so strenuously resisted disclosing specific figures. The firm has other business in addition to filing bankruptcy pleadings. Therefore the Court concludes that gross revenues would be substantially in excess of $10,000,000 per year.

not provide evidence of the commencement of efforts to address deficiencies prior to the imposition of a substantial monetary sanction in *Porcheddu*.  The Court concludes that monetary sanctions have been effective where warnings and signals have not.  Therefore, the Court concludes that monetary sanctions are necessary.

There was no persuasive evidence that the $2 million expenditures that Barrett Burke testified as having been made post-*Porcheddu* adequately focused on the problems raised in the prior cases or in the case at bar.  As noted above, those expenditures are substantially, (if not principally) for the ordinary costs of business: maintaining a sophisticated computer system, developing a new system that is potentially marketable independent of the firm's law practice, and generally administering a law firm with 400 employees.

And Barrett Burke testified that its efforts were responsive to *Porcheddu*, which Barrett Burke views as a problem of "false statement to the court" as opposed to a problem of inadequate pleadings and practices.  Despite warnings, Barrett Burke did not adequately address those latter issues pre-*Porcheddu*, and the evidence is that the issues were not substantially addressed until after the findings in the case at bar.  For example, Barrett Burke testified that it is looking for a supervisory lawyer to coordinate appearances at hearings, but that lawyer is not yet on board, and it was not clear what the focus of that new supervisor would be.  Would it be simply to assign a lawyer to attend a hearing or would it be to assure that fully informed, fully authorized attorneys attend hearings.  As late as *Gomez* that issue was not resolved.  And Barrett Burke did not hire former judge Brister until this Court asked how substantial the sanction would have to be in order to deter repetition of the conduct.  Therefore the Court concludes that further sanctions are necessary to make the point on the issues of incorrect, incomprehensible pleadings and failure to attend hearings, or sending counsel to hearings ill-informed and unprepared to prosecute the matter for hearing.

Having determined that sanctions are necessary, and that the sanctions must be monetary, the Court must determine what amount of monetary sanction is appropriate.  The Court concludes that the amount of sanctions must be substantial, greater than the amount in Porcheddu ($65,000).  The sanctions must also be proportionate.  Although Barrett Burke aggressively resisted disclosure of firm financial information, the evidence indicates that its revenues from bankruptcy pleadings similar to those at issue are between $9,675,000 and $11,610,000 annually. Expenditures for computer software, continuing education, and other related costs exceed $2 million.  Compensation to the senior bankruptcy supervising attorney is $500,000.  The Court concludes that $150,000 is a substantial amount, and is proportional as an amount that is less than 2% of revenues from filing bankruptcy pleadings (which is substantially less than total revenues), about 7.5% of computer software and CLE costs, about 30% of a single attorney's compensation package, and about 10 times the very conservative estimate of the costs and expenses of Barrett Burke's conduct.

Therefore the Court believes that the appropriate amount of sanctions in this case is $150,000.  However, because Barrett Burke recognizes the gravity of its actions and takes responsibility for those actions, and to recognize Barrett Burke's current intensity in addressing its deficiencies, the Court remits half of that sanction and imposes a sanction of $75,000.

Let this be clear.  No one suggests that Barrett Burke is not allowed to make mistakes. Filing 30,000 bankruptcy pleadings per year, mistakes will occur.

What is required, first, is that a careful, thoughtful attorney must review a document before it is filed and assure not only that the numbers are accurate, but also that the document makes sense, on its face, and communicates clearly and accurately the client's position.  Second, if a mistake is made, a thoughtful, clearly articulated correction must be filed into the record, not a meaningless form.  The correction must be timely and must be filed without the need for a party to seek coercion.  Third, Barrett Burke must send to the hearings on its motions an attorney who is fully informed and authorized to resolve the matter at the hearing, or if resolution of the matter at the hearing is not possible, the attorney must at least inform the court clearly and correctly what the problem is.

The sanction is imposed by separate order issued this date.

SIGNED 06/18/2007.

WESLEY W STEEN
United States Bankruptcy Judge